# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STAR REEFERS POOL INC., <br>     Plaintiff, <br><br> v. <br><br> A Cargo of NINETY-SIX (96) REFFER CONTAINERS, their equipment, appurtenances, etc., *in rem*, and KALISTAD LIMITED, JFC GROUP CO., LTD.,  WHILM MANAGEMENT LIMITED and BONANZA FRUIT CO., S.A. CORPBONANZA, *in personam,* <br>     Defendants. | ) <br> ) <br> ) <br> ) CASE NO.: 1:11-cv-10136 (GAO) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

### PLAINTIFF, STAR REEFERS POOL, INC.'S OPPOSITION TO DEFENDANT WHILM MANAGEMENT LIMITED'S EMERGENCY MOTION TO VACATE ORDERS OF MARITIME ARREST AND ATTACHMENT

Now comes the plaintiff, STAR Reefers Pool Inc. ("STAR Reefers"), and respectfully submits this opposition to defendant Whilm Management Limited's Emergency Motion to Vacate Maritime Attachment which was recently issued by the Court.

### Preliminary Statement

Plaintiff commenced this admiralty action to enforce a maritime lien by filing a verified complaint on January 25, 2011.  The complaint alleges an action against defendant A Cargo of Niney-Six (96) Reefer Containers ("the Cargo") *in rem* and against defendants Kalistad Limited ("Kalistad"), JFC Group Co. Ltd. ("JFC Group"), Whilm Management Ltd. ("Whilm"), and Bonanza Fruit Co., S.A. CORPBONANZA ("Bonanza"), *in personam*.  The complaint alleges (1) a claim against Kalistad and JFC

Group for non-payment of hire owed under time charters for plaintiff's vessels, the *M/V Avelona Star*, the *M/V Almeda Star* and the *M/V Cape Town Star*, and (b) a claim against all defendants for nonpayment of hire or freight and other costs owed for carriage, storage, handling and discharge of the Cargo on the M/V *Avelona Star* from the port of Evyap, Turkey in July 2010 to New Bedford, Massachusetts, where the Cargo was discharged in November 2010.  Plaintiff asserts a maritime lien on the Cargo based on the non-payment of these amounts by defendants.  (Verified Complaint, ¶ 17-50)

On January 26, 2011, upon the application by plaintiff, the Court (a) issued an *in rem* warrant of arrest of the Cargo, being held in storage at Maritime Terminal, Inc. in New Bedford, Massachusetts, pursuant to Rule C of the Supplemental Rules for Admiralty and Maritime Claims and Civil Forfeiture Actions ("the Supplemental Rules"), and (b) also issued an ex parte order directing process of maritime attachment and garnishment for the Cargo pursuant to Rule B(1) of the Supplemental Rules ("the January 26 Orders").  Defendant Whilm Management Ltd. ("Whilm") moves to vacate the January 26 Orders and requests a post-seizure hearing under Rule E(4).  Additionally, Whilm's motion seeks dismissal under Rule 12(b)(6) for failure to state a claim.

For the reasons discussed below, Whilm's arguments fail to refute the plaintiff's *prima facie* showing of (a) a valid maritime lien on the Cargo and thus a valid arrest *in rem* under Rule C, as a matter of law; (b) a valid admiralty claim against Kalistad, JFC Group, Whilm and Bonanza, and (c) Whilm's admitted property interest in the Cargo sufficient to sustain a valid maritime attachment under Rule B(1) as a matter of law. Accordingly, Whilm's motion should be denied in all respects.

Whilm contends that it has no connection to the time charters or to the carriage of the Cargo on the plaintiff's ship.   As the accompanying declarations and exhibits demonstrate, Whilm's contention is disingenuous at best.

Whilm fails to mention it has known that this Cargo would be carried on the *Avelona Star* under the Kalistad charter since prior to loading in Ecuador in June 2010. Whilm also fails to mention that it is a shell entity within the JFC Group family of companies, one of the largest fruit importers in Russia, which also includes JFC Group affiliates Kalistad and Bonanza.   (*See* Declaration of Edward Alastair David Dempster dated February 6, 2011 ("Dempster Decl."), ¶¶ 5-17, 23-25)   Indeed, Whilm's director who showed up most recently, "J. Romero," is, upon information and belief, the operations chief for Bonanza.   (*Id.* at ¶¶ 12-13)   Whilm/Bonanza's Romero loaded the ship in Ecuador.   (*Id.*)   Bonanza, as shipper, instructed that the Cargo be loaded on board the vessel, first at Ecuador in June 2010, and again at Turkey on July 24-25, 2010. (*Id.*) Whilm's sole director at the time of the charters in question, Valery Novozhenov, was JFC's director of logistics.   (*Id.* at ¶¶ 6-7)

Whilm/Bonanza's Romero, and the rest of JFC Group's enterprise, thus have known all along the *Avelona Star* was under charter, knew their affiliate Kalistad was the charterer, knew that much, if not all, of the Cargo was actually on lease from Whilm to Kalistad; and knew the Cargo thus belongs to Kalistad and its affiliates.   Whilm's motion has alleged it leased the Cargo from GESeaCo Services, Ltd. ("GESeaCo"), but did not disclose that it passed the Cargo lease onto Kalistad.   GESeaCo has asserted no claim here and has not appeared in the case to oppose the Court's orders.

Whilm has thus known that the charter had a lien clause; has known that the Cargo was being carried under a long-term contract of affreightment of Bonanza/Kalistad and JFC; and knew that the Cargo was being loaded on board in Turkey subject to the plaintiff's lien; and yet has failed to remove the Cargo from the vessel and to pay for the freight, storage and other charges.

Further, there is no "emergency" here. The Cargo has been in New Bedford since November 2010. Whilm has created this so-called "emergency" scheme to rush through proceedings in the hope of retrieving the Cargo with a sleight of hand, and to avoid paying the plaintiff what is owed. The fact that the plaintiff had moved for the arrest and of the Cargo does not create an emergency as Whilm alleges, where one did not exist for the last three (3) months or more while the plaintiff has had possession of the Cargo.

## STATEMENT OF FACTS

The relevant facts are set forth in detail in the accompanying declarations and exhibits, to which the Court is respectfully referred.[1]

## Argument

Whilm's motion advances essentially three arguments: (1) Whilm leases the containers from the alleged owner, GESeaCo, and they are not responsibile for unpaid

---

[1] The Charters provide that all disputes between Star Reefers and Kalistad are to be resolved by arbitration in London. Plaintiff has commenced an arbitration proceeding against Kalistad and a court proceeding against JFC Group in London in respect to the claims for breach of the Charters and specifically reserves its right to arbitrate and litigate the substantive matters at issue in those proceedings. This action is brought to obtain security in favor of plaintiff for the losses alleged. As set forth in the verified complaint, plaintiff seeks to recover at least $2,160,839, plus interest, costs and attorneys' fees. This amount includes: (a) unpaid hire in the amount of $1,658,438; (b) transport, discharge, storage and related costs for Tripoli to New Bedford, Massachusetts carriage of $418,416; (c) charterer's unpaid port dues in Tripoli of $38,450 and their unpaid Turkish compulsory pilotage/light dues of $45,535 in the total amount of $502,401.

hire under the time charter; (2) Whilm has no connection to the time charter and cannot be responsible for nonpayment of hire under that charter; and (3) the containers are somehow "wrongly held" by plaintiff and should be released to Whilm.   Whilm's arguments, however, fail to refute the plaintiff's *prima facie* showing that the arrest and attachment are valid under Rules B and C and that this Cargo actually belongs to the charterers Kalistad and JFC Group and is not an innocent third party's cargo; fail to recognize the applicable law providing for a maritime lien on such cargo; and fail otherwise to provide factual or legal support for its contentions.   Whilm's motion, therefore, should be denied in all respects.[2]

Kalistad/JFC Group owes unpaid charter hire in the sum of at least $2,160,839 due prior to the ship's arrival in New Bedford.  In addition, Kalistad/JFC Group owes hire or freight and other costs for plaintiff's transportation, handling, discharge and storage of their cargo voluntarily placed by charterers and their agents on the Vessel at Evyap and then not removed after Kalistad prematurely ended the charter in September 2010.  Kalistad/Bonanza/JFC Group had requested that plaintiff load and transport such cargo from Evyap to Ecuador, via intermediate ports of loading and discharge, including Tripoli, Libya, prior to termination of the charter.

**I.**

**WHILM'S MOTION SHOULD
BE DENIED IN ALL RESPECTS**

---

[2] There is no dispute that this is a case of admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333, and is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.  Plaintiff claims breach of a maritime contract for the charter of a vessel and breach of contract or bailment for the ocean carriage of cargo from a foreign port to a port in the United States.  Nor is there any dispute that venue is proper in this district pursuant to 28 U.S.C. § 1391 since the Cargo is located within this district.

A.      **Plaintiff Need Only Make A Showing Of Probable Cause**

Whilm acknowledges that its motion presents a narrow issue for resolution at this early stage.  In the leading decision, *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434 (2d Cir. 2006), the Second Circuit held that in a post-seizure hearing the plaintiff must show four elements:

> We therefore hold that, in addition to having to meet the filing and service requirements of Rules B and E, an attachment should issue if the plaintiff shows that 1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment. Conversely, a district court must vacate an attachment if the plaintiff fails to sustain his burden of showing that he has satisfied the requirements of Rules B and E.

460 F.3d at 445 (footnote omitted). [3]

In its motion papers Whilm does not contend that the plaintiff failed in meeting the filing and service requirements of Rules B, C and E.  Nor does Whilm contend that the plaintiff does not have a valid *prima facie* admiralty claim against Kalistad, JFC or Bonanza.  Whilm likewise does not argue that Kalstad, JFC, Whilm or Bonanza can be found in this District.

Whilm raises only two issues: (1) whether plaintiff has a maritime lien on the Cargo as a matter of admiralty law; and (2) whether Whilm has an attachable interest in

---

[3]   Whilm does not contest that U.S. maritime law applies to the arrest and attachment issue under Rules B and C before this Court, where the *in rem* arrest has been effected. *See Hawksphere Shipping Co., Ltd. v. Intamex, S.A.*, 330 F.3d 225 (4th Cir. 2003).  In fact, Whilm is authorized to do business in the United States (New York) and thus cannot complain that the application of U.S. law comes as a surprise or a hardship.

the property subject to attachment in this District.  The remaining defendants have filed

no objection to the orders.  Nor has the alleged owner of the containers, GESeaCo, filed

any such objection.

Although the rule in *Aqua Stoli* provides that the initial burden is on the plaintiff,

the Second Circuit in that case did not discuss the standard of proof required on a motion

to vacate under Rule E.  Whilm's motion fails to address that point as well, and perhaps

for a good reason: The burden placed on plaintiff is a light one.

The federal courts have consistently held that, in a Rule E, post-seizure hearing,

plaintiff need only demonstrate, at most, a probable cause for the attachment.  In *Amstar

Corp. v. S/S Alexandros T.*, 664 F.2d 904 (4th Cir. 1981), the Fourth Circuit stated: "A

shipowner challenging the validity of an arrest is constitutionally entitled to a prompt

post-arrest hearing in which the plaintiff has the burden of showing *probable cause* for

the arrest."  664 F.2d at 912 (emphasis added).

Courts since then have followed this standard of review.  *See, e.g., 20th Century

Fox Film Corp. v. M.V. Ship Agencies, Inc.*, 992 F. Supp. 1423, 1427 (M.D. Fla. 1997)

("probable cause and/or reasonable grounds for the issuance of the attachment");

*Continental Insurance Co. v. Adriatic Tankers Shipping Co., S.A.*, 1995 WL 649942, *1

(E.D.La. 1995) (not officially reported).

Following Chief Judge Wood's decision in *Tide Line, Inc. v. Eastrade

Commodities, Inc.*, 2006 WL 4459297 (S.D.N.Y. 2006) (not officially reported), the

courts in the Southern District of New York have held that the plaintiff need only make a

lesser *prima facie* showing, although it is not always clear whether all four *Aqua Stoli*

elements are meant or just the first requirement of a valid admiralty claim. *See*

*Proshipline Inc. v. Aspen Infrastructures Ltd.*, 533 F.Supp.2d 422, 426 (S.D.N.Y. 2008) (Plaintiff "must simply meet a prima facie standard."); *Ronda Ship Management v. Doha Asian Games Organising Committee*, 511 F.Supp.2d 399, 403 (S.D.N.Y. 2007).

In any event, a motion under Rule E(4) is not intended to finally dispose of a claim for which a valid attachment has been made. As the Third Circuit held in *Salazar v. Atlantic Sun*, 881 F.2d 73, 79-80 (3rd Cir. 1989): "The post-arrest hearing is not intended to resolve definitively the dispute between the parties, but only to make a preliminary determination whether there were reasonable grounds for issuing the arrest warrant, and if so, to fix an appropriate bond." *See also Thypin Steel Co. v. Certain Bills of Lading*, 1996 WL 223896, *4 (S.D.N.Y. 1996) (not officially reported).

## B.      Plaintiff Demonstrates Probable Cause.

Here, Whilm does not dispute that (a) the Court's Orders arrested and attached the Cargo in this District, (b) the Cargo was in the possession of plaintiff asserting a maritime lien against the Cargo for nonpayment of hire and other costs, and (c) Whilm alleges a property interest in the Cargo based on an alleged lease of the Cargo. These facts taken together establish probable cause that Whilm has a property interest in the attached Cargo.

Whilm's motion seeks to counter this *prima facie* showing by arguing that the Cargo is property leased to Whilm and owned by its lessor, GESeaCo, and that neither party has "any connection to the charter party dispute." (Whilm's Memorandum of Law at 1) However, Whilm's argument overlooks that, for more than a century, the federal courts have enforced maritime liens for unpaid charter hire and freight against cargo and sub-freights belonging to (a) the charterers, as here, and (b) parties other than the

charterers where the cargo interests had ample notice that the cargo was being carried on a chartered vessel and could be subject to a lien.  *See Hawksphere Shipping Co., Ltd. v. Intamex, S.A.*, 330 F.3d 225 (4th Cir. 2003); *Prozina Shipping Co., Ltd. v. Thirty-Four Automobiles*, 179 F.R.D. 41 (D. Mass. 1998); *Jebsen v. A Cargo of Hemp*, 228 F. 143 (D. Mass. 1915); *The Solhaug*, 2 F.Supp. 294 (S.D.N.Y. 1931); *see also Schilling v. A/S D/S Dannebrog*, 320 F.2d 628,629-30 (2d Cir. 1963) (Friendly, J.) (citing *Jebsen*, 228 F. 143); *The Bird of Paradise,* 72 U.S. (5 Wall.) 545, 554 (1866).

In *Jebsen v. a Cargo of Hemp,* 228 F. 143 (D. Mass. 1915), this Court enforced the shipowner's maritime lien on cargo for nonpayment of charter hire.  In so holding, this Court observed that the ship's lien on cargo is "ancient and well-settled law in admiralty."  There, as here, the ship was time chartered.  There, as here, the charter contained a lien clause giving a lien on all cargoes for freight or hire due under the charter and the shipowner asserted a maritime lien on the cargo of a sub-charterer.  This Court enforced the lien for nonpayment of the hire on a third-party's cargo.

Here, as in that case, the Charters contain a lien clause.  Clause 17 states: "The Owners shall have a lien upon all cargoes and sub-freights belonging to the Time-Charterers and any Bill of Lading freight for all claims under this Charter, and the Charterers shall have a lien on the Vessel for all moneys paid in advance and not earned."  (Dempster Decl. at ¶ 32)  The bills of lading issued by JFC Group/Kalistad and Bonanza for the Cargo at loading in Ecuador expressly incorporate the charter's terms.  (*Id.* at ¶ 13 and Ex. G)

Likewise, a more recent decision by the U.S. Court of Appeals for the Fourth Circuit in *Hawksphere Shipping Co., Ltd. v. Intamex, S.A.*, 330 F.3d 225 (4th Cir. 2003),

upheld an *in rem* arrest of cargo by the shipowner based on a maritime lien on cargo for unpaid freight, and affirmed the district court's order enforcing the shipowner's maritime lien against cargo even where the cargo was not owned by the charterers. The Fourth Circuit's reasoning there supports the shipowner's right here to a lien on such cargo as security for a claim of nonpayment of charter hire.

Here, contrary to Whilm's contention, the evidence shows that the Cargo was shipped by the charterers' group of JFC Group themselves, not by an innocent third-party shipper who paid freight and had no knowledge of the charter or a lien clause in the charter. The JFC Group entities include Kalistad, Whilm and Bonanza. (*Id.* at ¶¶ 10-11 and Ex. D)  Kalistad/Whilm/Bonanza loaded reefer containers on the Vessels for ocean carriage between Ecuador and various ports of the world.  (*Id.* at ¶ 9)  Moreover, Whilm fails to disclose in its motion that it actually passed the Cargo lease from GESeaCo to Kalistad, its affiliate in the JFC Group family of companies.

JFC Group guaranteed the performance of Kalistad under both charters.  In the guarantee, JFC Group refers to Kalistad as its "Nominee" and guarantees "in every way" "due performance" of the charters of the Vessels ("the Charters"), including the payment of charter hire.  (Dempster Decl." at ¶ 4)

JFC Group was a parent of Kalistad, Whilm and Bonanza upon information and belief.  The guarantees by JFC Group are signed by Andrey Afanasyev as Commercial Director of JFC Group.  He also appears as the CEO of Bonanza (*Id.* at ¶ 5)

Whilm leased or otherwise transferred its interest in most or all of the Cargo to Kalistad by a General Lease Terms ("GLT") dated 31st December 2007 and multiple leases thereunder by Whilm to Kalistad for at least 516 reefer containers.  (*Id.* at ¶ 6)

Whilm's "sole director," Valery Novozhenov ("Novozhenov"), signed the GLT for Whilm;  Kalistad's director, Dmitry Kasatkin ("Kasatkin"), signed for Kalistad.  (*Id.* at ¶ 6(c))

The GLT provides for Kalistad to pay Whilm a daily rent for each container and a "replacement value" for each container not returned, depreciated at an annual rate to not less than 60% of the replacement value.   Whilm also may assign its right, title and interest in the lease under clause 16.   Further, the "General Conditions" (clause 8) provide that Kalistad "shall be responsible and liable for, and shall indemnify and hold [Whilm] harmless against "*any . . . lien on, any Container.*" (Emphasis added).   By Lease # 002/2008, dated 31st December 2007, also signed by Novozhenov for Whilm and Kasatkin for Kalistad, Whilm leased 416 reefer containers to Kalistad for a period of 60 months from delivery on January 1, 2008 at Guayaquil, Ecuador.  This lease provides for a daily rent per container of $8.5, for handling charges, and for a replacement value of $21,000 per container.  (*Id.* at ¶ 6(d))  Further, by Lease # 007/2008, dated 28th March 2008, also signed by Novozhenov for Whilm and Kasatkin for Kalistad, Whilm leased another 100 reefer containers to Kalistad for a period of 60 months from delivery "not later than 30th September 2008 at the port of Guayaquil, Ecuador.  This lease provides for a daily rent per container of $9, for handling and "pre(post)" trip inspection charges, and for a replacement value of $21,000 per container.  (*Id.* at ¶ 6(e))  These two leases about 40 containers included in the Cargo at New Bedford here.  (*Id.* at ¶ 6(f))

Upon information and belief, Novozhenov was JFC Group's logistics director, and Kasatkin was JFC's in-house legal advisor.  (*Id.* at ¶ 7, Ex. D at 5-6 (Containers also

allow us to deliver [fruit] to Russia by sea . . . .  In 2007 the Group rented 430 containers with temperature controlled storage.") and Ex. F)

Whilm's motion fails to mention it has known that this Cargo was carried on the *Avelona Star* under the Kalistad charter since prior to loading in Ecuador in June 2010. Whilm's director, "J. Romero," is, upon information and belief, "Jose Romero," the operations chief for Bonanza.  Whilm/Bonanza's Romero loaded the *Avelona Star* in Ecuador.  (*Id.* at ¶ 12)  Bonanza, as the shipper on the bills of lading, instructed that the Cargo be loaded on board the vessel, first at Ecuador in June 2010, and again at Evyap, Turkey on July 24-25, 2010. (*Id.* at ¶ 13 and Ex. G)

Whilm's Romero, and the rest of JFC Group's enterprise, thus knew all along the *Avelona Star* was under charter; that affiliate Kalistad was the charterer; that much, if not all, of the Cargo was actually on lease from Whilm itself to Kalistad; and that the Cargo thus belongs to Kalistad and its JFC Group affiliates.  (*Id.* at ¶ 14)

In addition, Whilm, its counsel and its solicitor, all fail to disclose another relevant fact:  Kalistad, as "Agent to Owners," and JFC Group, as charterers, entered into a charter dated 1st November 2006, for the charter of reefer ships for a period of one year - - which they called a contract of affreightment ("COA") - - and by addendum dated the same date, extended the period until 31 December 2010.  (*Id.* at ¶ 16 and Ex. H)  JFC Group's legal advisor/Kalistad Director, Kasatkin, signed for Kalistad.  Kalistad/JFC Group employed the Vessels under this charter or COA.  (*Id.*)[4]

---

[4] That charter also contains a "Lien Clause" (Clause 8), which states: "The Owners shall have a lien on the cargo and on all sub-freights payable in respect of the cargo, for freight, deadfreight, demurrage, claims for damages and for all other amounts due under this Charter Party, including costs of recovering same."

Whilm thus also knew that the above charters had lien clauses and that the Cargo was being loaded on board in Turkey.

After Kalistad failed to pay hire, STAR Reefers commenced arbitration in London on March 12, 2010.  On June 23, 2010, JFC Group commenced proceedings against STAR Reefers in Russia in which it claimed that the charter guarantees were not binding on it (but STAR did not become aware of those proceedings until September 2010).

At the same time, on June 23-24, 2010, Kalistad, Whilm, JFC Group and Bonanza completed loading the Cargo on the Vessel at Ecuador; the Vessel carried the Cargo to the port of Evyap, Turkey under bills of lading; and the Vessel, as instructed by Kalistad, Whilm, JFC Group and Bonanza, discharged the Cargo there on or about July 15-16, 2010.  (*Id.* at ¶ 23 and Ex. G)  Roman Efanov a "specialist of the logistics department" in JFC Group and in the chartering/operations department of Bonanza, based in JFC Group's office in Russia, provided instructions to the Vessel for cargo handling during the voyage, and copied his colleague Denis Rodnov in chartering/operations of JFC Group/Bonanza.  (*Id.*)

On July 21, 2010, Kalistad/Bonanza, instructed the Vessel to return to Evyap to load the Cargo and to transport it to Ecuador.  (*Id.* at ¶ 24)   The Vessel did so, and on July 29, 2010, at the direction of Kalistad/Bonanza, then called at the port of Tripoli, Libya, where the Vessel was arrested and remained under arrest until on or about October 20, 2010.  (*Id.* at ¶ 25)

Despite plaintiff's requests, Kalistad/Whilm/Bonanza/JFC Group wrongfully failed to remove the Cargo at Libya or Agadir, where the Vessel planned to load her next cargo following Kalistad's termination.  They made no attempt to contact plaintiff until

October 26, 2010.  By this time the Vessel had already arrived at Agadir where it was not possible to discharge the Cargo without delay to the new charter and other problems. (*See* Declaration of John Andrew Phillips, dated February 4, 2011 ("Phillips Decl."), at ¶¶ 3-18, and Declaration of Jonathan Solomon, dated February 4, 2011 ("Solomon Decl."))  Whilm's Power of Attorney signed by Whilm/Bonanza's Romero acknowledges that the Cargo is on board the Vessel at Agadir. (Phillips Decl. at ¶ 17 and Ex. E) Kalistad/JFC Group/Whilm/Bonanza refused to pay freight and failed to provide proper authorization for the Cargo's release.  (*Id.* at ¶¶3-18*; Dempster Decl. at ¶ 27)

Plaintiff thus was required to transport, handle and store the Cargo that defendants left on the Vessel while calling at Libya, Agadir and Casablanca, and notified Kalistad, Whilm and Bonanza they should remove the Cargo at the next port of discharge, New Bedford, and to pay the hire and other charges, consistent with market rates.  (*Id.* at ¶ 28)

On this record, Whilm misplaces its reliance on *Prozina Shipping Co., Ltd. v. Thirty-Four Automobiles*, 179 F.R.D. 41 (D. Mass. 1998).   Unlike there, here the charterers' group shipped the cargo itself; and the ship performed the carriage of the Cargo loaded on board by the charterers' interests.  Unlike the innocent car owners in that case, the JFC Group of entities here directed the loading of their cargo, participated extensively in the chartered operations of the Vessel, knew of the lien clauses, and arranged the carriage.  In that case, the court held that a shipowner cannot maintain possession of a third-party's cargo as security for a claim of unpaid hire by a charterer where, unlike here, the cargo interests had no knowledge of the charter and the carrier had never left the dock and thus had not earned freight yet.  Unlike the experienced and sophisticated charterer's group of JFC Group/Kalistad/Whilm/Bonanza in the instant

case, the cargo interests in *Prozina* were innocent automobile owners who had no contact with the shipowner and were seeking the return of cars originally bound for Haiti, and the voyage was not performed.  The court there observed, however, that a lien on sub-freights ***"can be satisfied through a lien on cargo"*** against a third party to the charter where there is notice of the lien through, for example, bills of lading or the shipper is experienced in the import business and has a copy of the charter.  179 F.R.D. at 146 (citing *The Solhaug,* 2 F.Supp. 294, 300 (S.D.N.Y 1931).  Even the GESeaCo lease to Whilm expressly recognized "the Lease . . . constitutes the supply of Containers necessary for the operation of vessels . . . chartered or operated by the Lessee. . . ."  The *Prozina* court had no such facts, and did not mention this Court's decision in *Jebsen*.

Kalistad and Whilm's directors here thus had actual notice of the lien on the Cargo, the Charter lien, the Kalistad/JFC Group charter's lien clause, and the Charters, by at least March 2010, when plaintiff commenced arbitration - - well prior to loading the Cargo at Ecuador and reloading the Cargo on the Vessel at Evyap.  (Dempster Decl. at ¶ 33)

Whilm also argues that the containers are not cargo upon which a maritime lien would apply, but fails to explain.  However, such an argument disregards that the containers were received as part of the cargo on board the Vessel for which bills of lading had been issued, and were loaded, stowed and transported as cargo at the request of the charterer under the charter.  (*Id.* at ¶¶ 13-25; Verified Complaint, Schedule A)

Nor does GESeaCo's alleged ownership of the Cargo prevent the Court's orders.  First, GESeaCo is not a third-party shipper who pays freight for ocean carriage – they are commercial lenders in the profit-maximizing business of placing containers in ocean

carriage on chartered vessels.   In exchange for payment, GESeaCo allowed Whilm, Kalistad and JFC Group full use and control of these containers in the chartered operation of the Vessels.   The containers thus "belonged" to the charterers' group.   The lien clause is not limited to cargo "owned" by the charterer.   Whilm cites no case immunizing commercial lessors of ocean cargo containers from ship's liens; indeed, GESeaCo's lease with Whilm refers in clause 14 specifically to the risk of maritime liens.[5]

Second, the evidence calls into question GESeaCo's alleged ownership for at least some of the containers.   Despite its allegations now, Whilm asserts in the POA that it is the "registered owner" of the Cargo.   This assertion contradicts Whilm's assertion in the motion that it is the lessee of the Cargo and the Buckwell declaration's assertion to the same effect.   Further, GESeaCo's operations has at least twice confirmed to plaintiff that five (5) of the containers had "been recently sold" to "the previous lessee" before October 28, 2010.   (Phillips Decl. at ¶¶ 5, 6-7, 23)   On October 22, plaintiff received an email from GESeaCo's Buckwell with a list of only 91 containers, omitting five sold.   (*Id.* at 10)   Further, Buckwell and Whilm provide an incomplete document to the court.   They provide the general terms but not the specific lease agreements.   We would respectfully ask that Whilm provide all the lease agreements for completeness, and otherwise object and move to strike the exhibit.   *Cf.* Phillps Decl. at ¶ 21 and Ex. H (GESeaCo letter dated December 8, 2010 presented to the terminal lists ***nine*** lease agreements between 14 June 2006 and 1 November 2009).

The federal courts have already rejected the contention that an attachment can be vacated based on an assertion that someone else owns the property in which the

---

[5] Given the wide use of containers on ships in modern ocean commerce, the notion that a ship's lien on cargo does not cover a container leased by a commercial lessor whose trade is providing such containers for marine transport is unrealistic and impractical.

defendant has an interest. *See, e.g,. Chiquita International v. MV Bosse*, 518 F.Supp.2d 589, 593-94 (S.D.N.Y. 2007) (recognizing "the Second Circuit has held that "property" should be construed broadly and that, "[u]nder Rule B, it is also possible for more than one party to have an interest in the same property") (internal citations omitted); *AET Inc. v. Procuradoria de Servicos Martimos Cardoso & Fonesca*, 464 F.Supp.2d 241, 245 (S.D.N.Y. 2007); *Padre Shipping, Inc. v. Yong He Shipping*, 553 F.Supp.2d 328, 335 (S.D.N.Y. 2008) (observing that "[m]ultiple parties may have attachable interests in the same property," and that Rule B allows attachment of "defendant's tangible and intangible personal property." As *Winter Storm* commented, "it is difficult to imagine words more inclusive . . . .  What manner of thing can be neither tangible nor intangible and yet still be 'property?'") (internal citations omitted).

Rule B does not require that Whilm be the owner of the attached property. As stated in *HBC Hamburg Bulk Carriers GmbH v. Proteinas y Oleicos S.a.*, 2005 WL 1036127 at *4 (S.D.N.Y. May 4, 2005) (not officially reported), "Rule B is intended to impact *any property* in which the defendant has a legal interest. Nothing in the language of Rule B requires that the property attached be the exclusive property of the defendant. . . ." (Emphasis added).  Whilm retained sufficient interest to support attachment.

Further, the unity of interests of the JFC Group family of companies cannot be disregarded on this record.   Under federal common law, the corporate form will be ignored and liability imposed on another corporate entity, or the principals, if it is shown that the interconnected organization was utilized to perpetrate a fraud *or* where one entity or individual(s) so dominated another that it was, in effect, carrying on the principal's business. *See Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2d Cir. 1980).  In a maritime

case it is sufficient to show that the parent or controlling principal so dominated the subsidiary or other units within the group such that they were mere tools or instrumentalities to carry on the overall business of the principal. *See Kirno Hill* at 985; *Budisukma Permai SDN BHD v. N.M.K. Products & Agencies Lanka (Private) Ltd.,* 606 F.Supp.2d 391 (S.D.N.Y. 2009) (*prima facie* pleading suffices to avoid vacatur).

While there is no precise test to determine whether an entity is an alter ego of another, in general the corporate veil may be pierced where it can be demonstrated that the parent or controlling entity was the "true" or prime mover behind the subsidiary. *See Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 139 (2d Cir. 1991)(listing various factors considered in determining whether to pierce the corporate veil). *See also Carte Blanche (Singapore) v. Diners Club Intern.*, 758 F. Supp. 908, 918 (S.D.N.Y. 1991). Many of the documents required to establish these elements are solely within the control of Whilm, Kalistad, JFC Group and Bonanza; and discovery on the issue would be necessary.

Nonetheless, with arbitration pending in London there is no immediate need for the Court to resolve issues of corporate veils.[6] If plaintiff is unsuccessful in the arbitration, then all these issues become moot. It is sufficient for the vacatur motion before the Court to find that plaintiff has alleged a *prima facie* showing for its arrest and

---

[6] Whilm's reliance on the unsworn statement of Mr. Swinnerton is unavailing.  In fact, Mr. Swinnerton's statement made no mention that his firm represents Kalistad in the London arbitration in the court action, or that Whilm leases the containers to Kalistad.  He does not explain whether he is also acting for Whilm.  His statement contains a number of additional errors and omissions, which plaintiff details in the Declaration of its London solicitor, Andrew Rigden Green, dated February 4, 2011.

attachment. (The Cargo here can be readily sent to GESeaCo's depot in New York on defendants' posting security.)  The final disposition of the Cargo or any security provided in exchange of its release (and any discovery that may be needed) can await the outcome of the London proceedings.

## II.
## <u>WHILM'S RULE 12(b) MOTION SHOULD BE DENIED IN ALL RESPECTS</u>

Whilm argues that the Court should reach the merits of the underlying disputes and conclude that no claim can be stated against Whilm as a matter of law.  Based on the evidence detailed above, Whilm's argument is nonsense and should be rejected.

Whilm's request for counter-security should also be denied.  Whilm makes the request, but admits it is not a party to the counter-claim.  Therefore, under Rule E(7), Whilm cannot obtain counter-security.  Whilm asks for counter-security for a counter-claim by Kalistad, with whom Whilm claims it has no connection.  In any event, Whilm offers no evidence to support the alleged figure and any security should be limited to the amount of security provided by Whilm.

The leading decision is *Result Shipping Co., Ltd. v. Ferruzzi Trading USA Inc.*, 56 F.3d 394 (2d Cir. 1995). *See also Dongbu Express Co., Ltd. v. Navios Corp.*, 944 F. Supp. 235, 239 (S.D.N.Y. 1996) The governing principal is the Court's discretion. *Result Shipping*, *supra*, at 399 ("broad discretion"); *Clipper Shipping Lines Ltd. v. Global Transporte Oceanico S.A.*, 2007 WL 646329, *2 (S.D.N.Y. 2007) (not officially reported)(exercise of this discretion depends on the particular facts of the case)  Whilm has not acted equitably.  Also, Whilm's overreaching is shown by the instant motion. It is not asking for "an equality" (*Result Shipping, supra,* at 399) with plaintiff. It is seeking

countersecurity for the full amount of *Kalistad's* claim and offers no factual support.  *See also Coloured Fin Ltd. v. Readymix Abu Dhabi Ltd.*, 2009 WL 2568159 (SDNY 2009) (not officially reported) (reasoning that the policy of equality (as mentioned in *Result Shipping*) would best be served by requiring equal amounts.

       **WHEREFORE,** the court should deny Whilm's motion in all respects.

Respectfully submitted,
For the plaintiff,
By its attorneys,

**REGAN & KIELY LLP**
/s/ Joseph A. Regan
Joseph A. Regan, Esquire (BBO #543504)
John D. Blaisdell, Esquire (BBO) #652423)
88 Black Falcon Avenue, Suite 330
Boston, MA  02210
(617)723-0901 (phone)
(617)723-0977 (fax)
jar@regankiely.com
jdb@regankiely.com

    and

John R. Keough, III (NY Bar No. JK6013)
Waesche, Sheinbaum & O'Regan, P.C.
111 Broadway, 4th Floor
New York, NY 10006
(212) 227-3550
j.keough@waeschelaw.com

DATED:    2/07/11

## <u>CERTIFICATE OF SERVICE</u>

I, Joseph A. Regan, hereby certify that Plaintiff, Star Reefers Pool, Inc.'s Memorandum Opposition To Defendant Whilm Management Limited's Emergency Motion for Order To Show Cause filed through the ECF system, will be sent electronically to all registered participants as identified on the Notice of Electric Filing (NEF), and paper copies will be sent to those indicated as non registered participants, on February 7, 2011.

                                                   /s/Joseph A. Regan